UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHELLE EDWARDS,

               Plaintiff,

               v.

THOMSON REUTERS (TAX & ACCOUNTING) INC.,

               Defendant.

**OPINION AND ORDER**

19 Civ. 93 (ER)

Ramos, D.J.:

       Michelle Edwards brings this action against Thomson Reuters Inc. ("Defendant"), asserting gender and racial discrimination claims under the Equal Pay Act ("EPA") and 42 U.S.C. § 1981, as well as a § 1981 retaliation claim. On September 17, 2019, Defendant moved to dismiss the discrimination claims, Doc. 30, and on May 5, 2020, the Court granted Defendant's motion. Doc. 35. All that remains is Edwards' § 1981 retaliation claim. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Doc. 53. For the reasons discussed below, the motion is GRANTED.

## I.      FACTUAL AND PROCEDURAL BACKGROUND[1]

       From February 2011 to January 2018, Edwards—who is a Black woman—was employed by Defendant's Tax & Accounting Department in Hoboken, New Jersey. Doc. 1 at 2. Edwards began her employment as an Account Manager—an entry-level sales position. Doc. 55 (Def.'s 56.1) ¶ 5. In February 2014, Edwards began meeting with Marco Colacito, her Human Resources Business Partner ("HRBP"), to discuss career options, as she was interested in taking

---

[1] These facts are undisputed, unless otherwise noted.

on additional responsibilities, including those outside of sales. *Id.* ¶ 10.  Over the next several months, Colacito met with Edwards multiple times and assisted her in her search for other opportunities. *Id.* ¶ 12.  In May 2014, Defendant created a new role, "Associate Program Manager" as part of its recently-developed "Sales Associate Program," and hired Edwards for the role. *Id.* ¶ 13, 16.  In offering her the role, hiring manager Thomas Warren explained that the compensation structure for this new job differed from that of a sales representative. *Id.* ¶ 17.  In particular, Warren explained that Edwards would no longer be eligible to earn commissions. *Id.* Instead, she would receive a base annual salary of $75,000 and be eligible to participate in Defendant's annual bonus plan—the Annual Incentive Plan ("AIP"). *Id.*

Warren further explained that despite the increase to her annual base salary, Edwards' overall earnings in her new role likely would be less than the amount she earned as a sales representative. *Id.* ¶ 18.  In light of this, Warren gave Edwards the option to complete 2014 as a sales representative—earning commission—and create and manage the Associate Program at the same time. *Id.*  In the alternative, Edwards was offered the opportunity to begin working on the Associate Program immediately, at the new annual salary of $75,000, and begin participating in the AIP. *Id.*

Because she wanted to make more money, Edwards chose to take on both roles:  to manage and develop the Associate Program while at the same time earning commissions on her sales for the 2014 year. *Id.* ¶ 19.  As a result, although Edwards was hired for the Associate Program Manager role in May 2014, her official job title changed on January 1, 2015, at which point she began participating in the AIP. *Id.*

The AIP provides eligible employees with an opportunity to earn incentive pay based on eligible earnings and subject to Thomson Reuters' financial performance and a participant's own

performance. *Id.* ¶ 44. Under the AIP, an employee's bonus pay is called an "Award Payout." *Id.* ¶ 45. The AIP provides that a participant will not be eligible for an Award Payout if that participant resigns or voluntarily terminates employment on or prior to March 1 of the year following the close of the participant's performance period. *Id.* ¶ 47. In other words, to be eligible to receive a bonus for a certain year, an employee must remain employed through March 1 of the following year. *Id.* ¶¶ 47, 48.

As Associate Program Manager, Edwards was primarily responsible for overseeing the Associate Program, including recruiting and building her own team and developing a curriculum to train and educate her team of sales associates on Defendant's different tax and accounting products, so that they could ultimately become regular sales representatives. *Id.* ¶¶ 20, 21, 22.

In 2015, Edwards told Colacito, Warren, and Chris Gherardi, who was her HRBP at the time, that she was unsatisfied with her level of compensation. *Id.* ¶ 61. Edwards also spoke with Renee Kaspar, who was at the time Vice President of Human Resources, about her desire to make more money. *Id.* Edwards explained that she made approximately $20,000 less as an Associate Program Manager than what she made previously in her non-managerial sales role. *Id.* ¶ 62. But Edwards was told that because the Associate Program was a brand-new program, Defendant had to gauge its performance and success before making any changes to compensation. *Id.* ¶ 63.

Edwards' gross pay in 2015 was $91,748.58. *Id.* ¶ 50. As part of her total compensation, she received a $11,224.25 bonus under the AIP. *Id.* Consistent with the terms of the AIP, Edwards received the bonus in March of the following year—on March 11, 2016. *Id.*

In 2016, Defendant needed help recruiting a large number of sales representatives across the tax and accounting business, and Edwards was tasked with recruiting candidates for the various roles. *Id.* ¶ 64. As a result of this, in September 2016, Edwards received a $6,500 referral bonus for her efforts in successfully recruiting two candidates. *Id.* Edwards also received a $7,894.34 bonus under the AIP. *Id.* ¶ 51. Edwards received her 2016 bonus in March of the following year, on March 10, 2017. *Id.*

Also in 2016, the Associates Program expanded to include a professional services program, and, as a result, Edwards' responsibilities increased as she was charged with recruiting, training, and managing associates for two different programs. *Id.* ¶ 29. That year, Edwards approached her manager, Adam Kupperman, and requested a promotion. *Id.* ¶¶ 23, 24, 34. Kupperman was receptive to Edwards' request and advocated for her; as a result, she was promoted to Senior Manager of Sales Development on July 2, 2017. *Id.* ¶ 35. Edwards received a salary increase to $90,570.26. *Id.* ¶ 53.

In 2017, the Associates Program was converted into a full-time sales development program—previously, it had been part-time summer internship program—and the sales associates who had been retained as part-time interns transitioned into full-time employees known as Sales Development Associates ("SDAs"). *Id.* ¶¶ 25, 65. The SDAs were entitled to a base salary as well as a small fee for every lead they generated (a lead is an opportunity to make a future sale; that sale is then handled by a regular sales representative). *Id.* ¶¶ 65, 66. Edwards, as manager of the SDAs, wanted to earn a fee for each lead as well; in other words, Edwards felt she should be on a sales incentive plan as opposed to the AIP. *Id.* ¶ 67. But, because she did not manage sales representatives—the SDAs only generated leads—she was ineligible to participate in a commission plan. *Id.* ¶ 69.

4

Edwards alleges that in March 2017, she complained to Kaspar that she suspected she was paid less than certain of her white male coworkers. Doc. 20 ¶ 21. Specifically, Edwards alleges she complained to Kaspar that similarly-situated white male coworkers had been receiving larger base salaries and larger bonuses for substantially similar work. *Id.* Edwards alleges Kaspar told her she would "look into it." *Id.* ¶ 22. Edwards again met with Kaspar in July 2017 to complain—upon information and belief—that she was paid less than her white male coworkers, many of them junior to her.[2] *Id.* ¶¶ 20, 23. Edwards alleges Kaspar told her "there is an issue here" and "[w]omen and minorities are not being paid what they should." *Id.* ¶ 24. According to Edwards, Kaspar then recommended that she raise these concerns with her supervisor, Kupperman.[3] *Id.* ¶ 25. Kupperman maintains he was never made aware that Edwards and Kaspar discussed Edwards' pay or that Edwards suspected she was paid less because of her race and gender. Doc. 55 ¶ 72.

In the third or fourth quarter of the 2017 fiscal year, Edwards and Kupperman began discussing plans for Edwards' role and the sales development function going forward. *Id.* ¶ 86. Specifically, they had several discussions about expanding Edwards' role and the sales development function, which previously had focused only on outbound lead generation, to also include inbound marketing leads, and supporting some of the sales representatives in their sales activities. *Id.* They also discussed compensation during these conversations and, in September

---

[2] Edwards also alleges in her second amended complaint that she spoke with Kaspar about her pay "dozens of times" throughout October and November 2018. Doc. 20 ¶ 31. By that time, Kaspar was no longer employed by Defendant, having been terminated in December 2017. Doc. 55 ¶¶ 96, 97.

[3] While Edwards alleges in her second amended complaint that she complained to Kupperman about unfair pay disparities and that, in this meeting, she characterized her compensation as discriminatory, *see* Doc. 20 ¶¶ 26, 27, she directly refutes this claim in her opposition to Defendant's motion. In her opposition, Edwards does not allege that she complained to Kupperman about discriminatory pay, but instead alleges only that Kupperman *knew* of her complaint because Kaspar told him. Doc. 63 at 5. Specifically, Edwards explains she "*never had to* make the complaint to . . . Kupperman because he *already knew*" of her complaint to Kaspar. Doc. 63-2 ¶ 71 (emphasis added).

2017, Edwards told Kupperman she wanted a raise.  *Id.* ¶ 87.  Kupperman told Edwards he would look into increasing her overall compensation to align with the expanded role she would take on starting in 2018.  *Id.* ¶ 88.  At the same time—in the fall of 2017—Edwards began looking for a new job.  *Id.* ¶ 99.

In September 2017, Kupperman requested that Nancy Brill, who was then Edwards' HRPB, conduct a compensation benchmark exercise for Edwards' new, expanded role.  *Id.* ¶¶ 89, 90.  On December 2, 2017, Kupperman emailed Brill a proposed compensation structure for Edwards' new role with a minimum base salary of $110,000 and a commission/bonus opportunity of $27,500, for a total income potential of $137,500.  *Id.* ¶ 92.

On December 12, 2017, Edwards received a job offer from Poppin, Inc. ("Poppin"), a furniture design company based in New York.  *Id.* ¶ 100.  Edwards accepted the offer that day and, on December 13, 2017, met with Kupperman to inform him of her resignation.  *Id.* ¶ 101.  Kupperman alleges he was surprised by Edwards' resignation, as he had been advocating for increased compensation commensurate with her expanded role.  *Id.* ¶ 102.  Kupperman also alleges he was disappointed by her sudden resignation, as they had had a good working relationship.  *Id.* ¶ 103.  In response, Edwards notes that if Kupperman in fact had been disappointed, "he would have negotiated [with her] or counteroffered, but he . . . [n]ever tried to retain" her.  Doc. 63-2 ¶ 103.

According to Kupperman, Edwards gave several reasons for her resignation:  she felt the role was becoming increasingly stressful and she struggled with supporting multiple stakeholders across five or six business units; she was concerned about her ability to effectively manage her team, as she would be based in Hoboken while most of her team would be based in Carrolton, Texas; and she felt the company had become "more hierarchical and bureaucratic."  Doc. 55 ¶

107.  Edwards does not dispute that these are the reasons she shared with Kupperman, but notes that Kupperman is wrong to "imply[] that the list is exhaustive."  Doc. 63-2 ¶ 107.  Edwards does not explain what other reasons, if any, she shared with Kupperman when she met with him about her resignation.  As Kupperman explains, Edwards never raised compensation as one of the reasons for her resignation.  Doc. 55 ¶ 108.  Again, Edwards does not dispute this, but instead claims that "compensation . . . was a known issue . . . that Kupperman knew about for months."  Doc. 63-2 ¶ 108.

On December 19, 2017, Edwards spoke with Brill.  Doc. 55 ¶ 110.  Edwards told Brill that she had decided to resign because there was a lack of opportunity in Hoboken, where she was based, she had no work-life balance, she would earn more money at Poppin, and there were too many "processes and obstacles at Thomson Reuters that were slowing things down."  *Id.*

After Edwards gave notice of her resignation, Kupperman requested that she stay on as long as possible to help transition her responsibilities to her replacement.  *Id.* ¶ 122.  Edwards agreed to stay on to assist with the transition process until January 11, 2018.  *Id.* ¶ 111, 122.

On her last day of employment, Edwards completed a survey, where she provided the reasons for her resignation and general feedback about her experience working for Defendant.  *Id.* ¶ 111.  Edwards noted in the survey that her dissatisfaction with her compensation was one of the main reasons she resigned.  *Id.*  Edwards did not raise any concerns relating to discrimination—in her pay or otherwise—in the survey.  *Id.*

Consistent with the terms of the AIP—which required her to remain employed until March 1, 2018, to be eligible to receive her 2017 bonus, Edwards did not receive a bonus for the 2017 year, as she resigned from Thomson Reuters effective January 12, 2018.  *Id.* ¶ 54.

On January 4, 2019, Edwards filed the instant complaint.  *See* Doc. 1.  On February 14, 2019, she filed an amended complaint as of right.  Doc. 3.  On May 31, 2019, Defendant filed a motion for more definite statement, Doc. 15, and on June 12, 2019, the Court granted Edwards leave to file a second amended complaint.  She did so on June 19, 2019.  Doc. 20.  On September 17, 2019, Defendant moved to dismiss Edwards' discrimination claims under the EPA and § 1981.  Doc. 30.  The Court granted Defendant's motion.  Doc. 35.  Edwards' only remaining claim is her § 1981 retaliation claim.

## II.      LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.*  (quoting *SCR Joint Venture L.P*, 559 F.3d at 137).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986)).  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).

## III.   DISCUSSION

Edwards' retaliation claim under § 1981 is analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (applying *McDonnell* framework to § 1981 claims); *Taitt v. Chem. Bank*, 849 F.2d 775, 777 (2d Cir. 1988).  Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of retaliation.  *McDonnell*, 411 U.S. at 802.  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its actions.  *Id.* at 802–03;

*Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).  If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual.  *Id.* at 804; *Kirkland*, 760 F.3d at 225.

To state a *prima facie* case of retaliation under § 1981, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).

Here, Edwards alleges she engaged in a protected activity when she complained to Kaspar about her pay in March and July 2017.  Doc. 20 ¶ 21.  Specifically, Edwards alleges she told Kaspar that she suspected that, because of her race, she was paid less than certain of her white coworkers.  *Id.* ¶ 20, 21.  Edwards notes she made these complaints "upon information and belief."  *Id.* ¶ 20.  As Edwards explained in her deposition, she was dissatisfied with her pay and, in meetings with Kaspar, "question[ed] the reasons for why [she] was dissatisfied, wondering if there was some type of race or something involved with those decisions."  *See* Doc. 63-1 at 140.

In support of her claim that she complained of discrimination to Kaspar, Edwards cites only to her own deposition testimony.  Indeed, throughout her opposition to Defendant's motion, Edwards does not cite to anything other than her own deposition, and in her opposition to Defendant's Rule 56.1 statement, Edwards does not cite to any evidence at all.  In other words, there is no evidence in the record—beyond her deposition testimony—that Edwards made any complaints—to Kaspar, Kupperman, or anyone else—alleging discriminatory pay.

Where a record is devoid of any evidence to support a claim other than a plaintiff's own self-serving statements, courts have, at times, expressed skepticism as to whether the plaintiff's own account could be found sufficient to raise a genuine issue of fact at the summary judgment stage. *See Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (noting that "plaintiffs rely almost exclusively upon their own deposition testimony in order to support their claims . . . [and] have made no attempt . . . to square their own speculative, and subjective, testimony with the [] evidence adduced during discovery" and, in that circumstance, finding plaintiffs' testimony "insufficient to defeat summary judgment") (internal quotation marks and citation omitted). Nonetheless, a plaintiff's "own testimony . . . constitute[s] admissible evidence," and, thus, Edwards' testimony "should not [be] excluded from consideration in reviewing defendant's summary judgment motion." *Yang v. Navigators Grp., Inc.*, 674 F. App'x 13, 14 (2d Cir. 2016) (summary order); *see also Danzer*, 151 F.3d at 57 ("There is nothing in [Rule 56] to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against a motion for summary judgment.").

In light of this, the Court finds Edwards has plausibly alleged she engaged in a protected activity. "A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.'" *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 400 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)); *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97 Civ. 1673 (DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that [a statute] forbids."). While a protected activity generally involves the filing of a formal complaint of discrimination with an administrative agency, *see Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), "both formal and informal complaints [are]

11

protected activity . . ." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391

(S.D.N.Y. 2019) (citing *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680–81 (2d Cir.

2009)).

Protected complaints generally include "making complaints to management . . . and

expressing support of co-workers who have filed formal charges." *Soliman*, 2004 WL 1124689,

at *12 (citing *Cruz*, 202 F.3d at 566); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209

(2d Cir. 1990).   An informal complaint may be "nothing more than a simple objection voiced to

the employer, . . . but at the very least, there must be some form of professional indicia of a

complaint made against an unlawful activity." *Soliman*, 2004 WL 1124689, at *12 (internal

quotation marks and citations omitted).

To constitute a protected activity, an informal complaint must be sufficiently specific to

make it clear that the employee is complaining about statutorily prohibited conduct. *See, e.g.*,

*Galdieri-Ambrosini v. Nat'l Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)

("[I]mplicit in the requirement that the employer have been aware of the protected activity is the

requirement that it understood, or could reasonably have understood, that the plaintiff's

opposition was directed at conduct prohibited by [statute]."); *Thomas v. iStar Fin., Inc.*, 438 F.

Supp. 2d 348, 365 (S.D.N.Y. 2006) ("[C]omplaints centered on general allegations of harassment

unrelated to race [ ] are not protected activity under Title VII."); *Krasner v. HSH Nordbank AG*,

680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010) ("The law protects employees [who] . . . make[]

informal protests of discrimination, including making complaints to management, so long as the

employee has a good faith, reasonable belief that the underlying challenged actions of the

employer violated the law.") (internal quotation marks and citation omitted).

Here, Edwards alleges she made a number of verbal complaints to Kaspar—who was, at the time, Vice President of Human Resources—relating to her suspicions of race-based discriminatory pay.  These complaints—even if informal—are sufficiently specific to constitute protected activity.  Her complaints are not only sufficient to support an allegation of protected activity, but they are also enough to demonstrate the second element of Edwards' retaliation case, that the defendant had knowledge of the protected activity.

The Second Circuit has established that general corporate knowledge is sufficient to satisfy this requirement.  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity") (citations omitted); *see also Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (holding that a plaintiff's complaint to an officer of the company communicated her concerns to the company as a whole for purposes of the knowledge prong of the *prima facie* case); *Peddy v. L'Oreal USA, Inc.*, No. 18 Civ. 7499 (RA), 2020 WL 4003587, at *18 (S.D.N.Y. July 15, 2020), *aff'd*, 848 App'x 25 (2d Cir. 2021) (plaintiff met second prong of her *prima facie* case when she sent a complaint to Senior Vice President for HR).  Here, Edwards complained to Kaspar, Vice President of Human Resources; it is irrelevant whether Kaspar shared these complaints with Kupperman, or with anyone else at Thomson Reuters.

Edwards' retaliation claim fails, however, upon reaching the third prong, as she cannot allege an adverse employment action that followed her complaints.  Edwards alleges Defendant took adverse action against her by giving her "false assurances" that she would receive higher pay, failing to convince her to stay after she announced her resignation, and refusing to make an

13

exception to the bonus policy for her.  Doc. 63 at 6.  None of these amounts to an adverse employment action under § 1981.

A materially adverse action for purposes of a retaliation claim is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).  As the Supreme Court stated in *White*, "[t]he antiretaliation provision [of § 1981] protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Id.* at 67.  Thus, the Court explained that "[w]e speak of *material* adversity because we believe it is important to separate significant from trivial harms.  [§ 1981] does not set forth 'a general civility code for the American workplace.'"  *Id.* at 68 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998)) (emphasis in original).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience . . . personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under [§ 1981]."  *Id.* (internal quotation marks and citation omitted).  The Supreme Court also emphasized the importance of applying an objective standard for judging the alleged harm, referring to how a *reasonable* employee would react rather than to the plaintiff's subjective reaction.  *Id.* at 67–69.  "[A] plaintiff's subjective feelings cannot be used to determine whether an employment action is adverse."  *Jones v. N.Y. City Bd. of Educ.*, No. 09 Civ. 4815, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012) (internal quotation marks and citation omitted).

14

Edwards alleges that after she told Kupperman she was unhappy with her pay, he "told [her] several times [that] he was working on it," but she "never saw any actual movement." Doc. 63-1 at 140. According to Edwards, Kupperman told her "for several months . . . that they were working on it [and] that he hadn't forgotten," *id.* at 250, but, Edward alleges, these were no more than "false assurances." Doc. 63 at 7. Edwards alleges she first requested a higher salary from Kupperman in September 2017. *See id.* Edwards resigned two months later, in December 2017. *Id.*

Defendant's failure to immediately grant Edwards a raise when, as Defendant explains—and as Edwards does not dispute—Defendant "needed to undergo certain internal benchmarking and approvals" before increasing her pay, *see* Doc. 67 at 6; Doc. 63-2 ¶¶ 89–94, is not an adverse employment action. Edwards' frustration that Defendant spent several weeks working on an increase to her pay is, at most, a "petty slight[]" or "minor annoyance[]." *White*, 548 U.S at 68. Indeed, Edwards does not dispute that when she and Kupperman discussed plans for a new role and accompanying raise, they agreed she would take on the role in 2018 and that compensation increase would not take effect until then. Doc. 63-2 ¶¶ 86–88. Edwards also does not dispute that, in September 2017, after meeting with her, Kupperman initiated a compensation benchmark exercise for her new role. *Id.* In other words, at the time of her resignation, Edwards knew Kupperman had started the process for calculating the increase in compensation for her new role, and she also had no reason to expect the raise any sooner than early 2018, when she and Kupperman agreed she would assume the new role. In any event, Edwards does not show how this delay caused her any material harm.

Edwards also alleges that after she resigned, Defendant made no attempt to convince her to stay and "simply let her walk out the . . . door." Doc. 63 at 8. Edwards complains that after

she gave notice of her resignation, there was "no pushback, no negotiation," and no attempt to persuade her "to reconsider and stay." *Id.* at 8–9.  Again, this is not an adverse employment action:  Edwards cannot show—and does not try to show—how Defendant's failure to urge her to stay *after she resigned* caused her to suffer any material harm or would have "dissuaded [her] from making . . . a charge of discrimination."  *White*, 548 U.S. at 68.

Last, Edwards alleges Defendant did not create an exception for her to its AIP bonus policy.  This is also not an adverse employment action.  As stated above, Defendant's AIP is only available to employees who stay on until March 1 of the following year.  Doc. 55 ¶ 47.  Because Edwards resigned effective January 2018 she was ineligible to receive a bonus under the AIP for 2017.  *Id.* ¶ 54.  Edwards does not dispute that she was ineligible for a bonus for 2017, but instead argues she should have been granted an exception to the policy.  Doc. 63 at 12.  But Defendant is under no obligation to deviate from its policy and its refusal to do so does not constitute an adverse employment action.  *See, e.g.*, *Cronin v. ITT Corp.*, 737 F. Supp. 224, 230–31 (S.D.N.Y.), *aff'd*, 916 F.2d 709 (2d Cir. 1990) (no retaliation where plaintiff was denied special award because he did not fulfill conditions necessary to receive special award); *Chastven v. Cigna Corp.*, No. 97 Civ. 6013 (RPP), 1999 WL 1034753, at *11 (S.D.N.Y. Nov. 12, 1999) (plaintiff's failure to receive a commission for a particular sale did not constitute an adverse employment action, as he was not eligible to receive such a commission under defendant's policies).

Because Edwards cannot allege an adverse employment action, her *prima facie* retaliation case fails, and summary judgment must enter for Defendant.

### IV.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is

GRANTED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 53, and

close the case.

It is SO ORDERED.


Dated:    March 14, 2022
          New York, New York

_____
                EDGARDO RAMOS, U.S.D.J.